UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                -v-                17-Cr. 10385 (MLW)

RHONDA FULTON,

                Defendant.

----------------------------------------------------------------------X

_____

## MS. FULTON'S SENTENCING MEMORANDUM
_____

COMES NOW, Rhonda Fulton, through her court appointed counsel, Inga L. Parsons, and hereby submits her Sentencing Memorandum in support of a non-incarceratory sentence. [1]

## PRELIMINARY STATEMENT

Ms. Fulton accepted responsibility in her statements to the officers and government at the outset of this case. She became involved in this offense through her husband. She has a history of prior sexual and spousal abuse. Ms. Fulton has been diagnosed with a number of mental health and medical conditions and requires continued therapy and treatment which would be disrupted by a term of imprisonment. We respectfully request a sentence of time served as discussed below.

## SENTENCING LAW

---

[1] This memorandum is being submitted at this time due to defense counsel being on four back to back trials and having family medical commitments and her son's graduation that prevented an earlier filing.

1

This Court is obviously well aware of the federal law applicable to sentencing. The defense would just highlight some of the most important general guiding principles that 18 U.S.C. § 3553(a) requires sentencing courts to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph 2." This is known as the "parsimony" principle and is an "overarching instruction" of application of 18 U.S.C. § 3553 as described by the United States Supreme Court in *Kimbrough v. United States,* 128 S.Ct. 558, 563 (2007); *see also, United States v. Rodriguez*, 527 F.3d 221, 223 (1st Cir. 2008) (noting that the § 3553(b) factors are more than a laundry list of matters to be considered but comprise a "tapestry of factors, through which runs an overarching principle," the court's duty "to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing.")

Section 3553(a)(2) states that such purposes are:

    A.    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    B.    to afford adequate deterrence to criminal conduct;

    C.    to protect the public from further crimes of the defendant; and

    D.    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider the Federal Sentencing Guidelines in addition to such diverse and individualized factors as the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwanted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(7).

The defense submits that these factors justify a variance of the guidelines and a non-incarceration sentence for Ms. Fulton to allow her to continue with her therapy and medical treatment.

## BACKGROUND

### [(1)(a)(1) History and Characteristics of the Defendant]

Ms. Fulton was born in Lowell, Massachusetts growing up without a father from the age of six living in a housing project infested with cockroaches. Her mother had to raise four young children and it was an extremely difficult childhood. Ms. Fulton was molested by both her uncle and grandfather and was verbally and physically abused and battered by her first husband including holding a gun to her head, wrapping a telephone cord around her neck, kicking and punching her while she was pregnant and throwing her down a flight of stairs. Finally, she was able to get a restraining order which was "life time" from the Chief Justice Mary Fitzpatrick of the Probate Court in Boston, Massachusetts.

Unfortunately, the TRO did not stop him and her ex-husband continued the abuse which eventually escalated into stalking and harassing both Ms. Fulton and her family. Her former husband was a police officer so he had access to her addresses and phone numbers every time she tried to move or change her number. They were in and out of court for years on the violations of the restraining order. From the time her son was born in 1991, at the age of 24, she moved out of the house and stayed with her mother in a two-bedroom home back at the projects. (She is now the mother of three children and seven grandchildren.) Her ex-husband lost visitation and ultimately committed suicide in 2003. The result has been a form of battered woman's syndrome through the psychological capitulation to men.

In 2007, Ms. Fulton's doctor referred her to Psychiatrics Associates of Lynn and she has been seeing psychiatrists and psychologists ever since also suffering from PTSD, Bi Polar, Clinical Depression, Severe Anxiety and ADHD due to all the stressors in her life both past and present. Ms. Fulton takes a number of medications.

Ms. Fulton's son has had psychological issues in large part due to the abandonment and suicide of his father and turned to drugs and eventually heroin and fentanyl. He has had a number of overdoses and has been in rehab and detox clinics which has impacted Ms. Fulton's mental health and stress. It continues to be an everyday struggle for the entire family but Ms. Fulton is an important part of his support for his recovery and believes it would devastate her son should she be imprisoned.

Ms. Fulton has a very good work history. She worked at citizens bank for fourteen years and was transferred to TD Bank. She also worked for Salem State for five years. Obviously, this felony conviction will severely impact her employability and currently she is receiving disability due to her mental health issues. Ms. Fulton is 51 years old.

Ms. Fulton had known Michael Fulton for years and started dating in 2011. In April of 2014, they married and later moved to Florida. On September 10, 2017, the Fultons lost everything they owned to Hurricane Irma, including their furniture, car, most of their clothing, and many irreplaceable items (pictures, drawings, christening gowns, cards from her children and grandchildren. They have only what they could carry in their arms. The rest of their property was either destroyed by wind, water or sewage. The two have attempted reconciliation but at present have separated.

Growing up, Ms. Fulton's prognosis given her background were grim. Statistics reveal that fatherless children are four times more likely to be poor. In 2011, 12 percent of children in

married-couple families were living in poverty, compared to 44 percent of children in mother-only families. *See U.S. Census Bureau, Children's Living Arrangements and Characteristics: March 2011, Table C8. Washington D.C.: 2011.*

Children living in female headed families with no spouse present had a poverty rate of 47.6 percent, over four times the rate in married-couple families. *See U.S. Department of Health and Human Services; ASEP Issue Brief: Information on Poverty and Income Statistics. September 12, 2012 http://aspe.hhs.gov/hsp/12/Poverty And IncomeEst/ib.shtml.*

A study of 1,977 children aged three and older living with a residential father or father figure found that children living with married biological parents had significantly fewer externalizing and internalizing behavioral problems than children living with at least one non-biological parent. *See, Hofferth, S. L. (2006). Residential father family type and child well-being: investment versus selection. Demography, 43, 53-78.* Indeed, children of single-parent homes are more than twice as likely to commit suicide. *See, The Lancet, Jan. 25, 2003 • Gunilla Ringbäck Weitoft, MD, Centre for Epidemiology, the National Board of Health and Welfare, Stockholm, Sweden, et. al. http://www.webmd.com/baby/news/20030123/ absent-parent- doubles- child-suicide-risk.*

Children in grades 7-12 who have lived with at least one biological parent, youth that experienced divorce, separation, or nonunion birth reported lower grade point averages than those who have always lived with both biological parents. *See Tillman, K. H. (2007). Family structure pathways and academic disadvantage among adolescents in stepfamilies. Journal of Marriage and Family.* Similarly, children living with their married biological father tested at a significantly higher level than those living with a non-biological father. *See id.* Studies show that father involvement in schools is associated with the higher likelihood of a student getting

high grades. This was true for fathers in biological parent families, for stepfathers, and for fathers heading single-parent families. *See, Nord, Christine Winquist, and Jerry West. Fathers' and Mothers' Involvement in Their Children's Schools by Family Type and Resident Status. (NCES 2001-032). Washington, D.C.: U.S. Department of Education, National Center for Education Statistics, 2001.*

Nevertheless, Ms. Fulton is a survivor and managed to raise a family and earn a living until her mental disabilities precluded continued work. She has been grateful for the support and counseling she has received while in pretrial supervision and has developed a strong bond with her supervisor.

While § 5H1.6 provides that family circumstances are not 'ordinarily relevant' in determining whether a departure is warranted, a sentencing court is required to consider 'the history and characteristics of the defendant' 'in determining the particular sentence to be imposed.'" *See* 18 U.S.C. §3553(a)(1); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *Witte v. United States,* 515 U.S. 389, 398, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) ( "Thus, [a]s a general proposition, a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.") (citation and quotation marks omitted) (alteration in original) (cited in *United States v. Thavaraja*,740 F.3d 253, 262 (2d Cir. 2014)).

Ms. Fulton's connections to her family provide additional confidence that she will not come before this Court again. Studies using theoretical perspectives which focus on the

positive roles and functions that families serve (as opposed to the problems that they experience) indicate that "families are important to [those convicted] and to the achievement of major social goals, including the prevention of recidivism and delinquency." Hariston, et. al., *From Prison to Home: The Effect of Incarceration and Reentry on Children, Families, and Communities. Prisoners and Families: Parenting Issues During Incarceration* (Dec. 2001) http://aspe.hhs.gov/hsp/ prison2home02/Hairston.htm. Ms. Fulton's strong commitment to her children and grandchildren provide additional reasons for why she will never be before this Court again and justify a non-incarceratory sentence. She has also been involved with her art which has been an emotional outlet as well as a creative outlet.

    Ms. Fulton's family has submitted letters of support which detail her strong family support and the aberrant nature of her behavior which are attached as Exhibit A. This information is not submitted to excuse Ms. Fulton, but to explain Ms. Fulton vulnerability and history and how that impacted her choices. She takes full responsibility for her actions and although she did not fully appreciate the extent of the seriousness of what she was involved with at the beginning given that Michael was a body builder, she certainly does so now and throughout she urged her husband to stop. She came forward immediately and was cooperative with both the agents and the government and has no prior criminal record.

## THE OFFENSE

### [1(a)(1) Nature and Circumstances of the Offense]
### [(2)(A) The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment]

    At the outset Ms. Fulton naively believed that steroids were not illegal and that were used as a supplement and bodybuilding enhancer legitimately. Ignorance of the law is no excuse but

it does given context for how she got involved, in addition to her desire to assist her husband and to follow his requests which is her personality as a formerly abused wife who capitulates.  She received the orders and shipped them out.  Her history is to capitulate to men and there was certainly an element of that in her involvement and continued involvement but she takes full responsibility for her actions and realizes that she has to make decisions for herself and to resist giving in to others especially men in relationships.

Ms. Fulton now fully understands that what she did was a crime and that she should not have given in to her husband.  Her therapy is an essential part of her recovery and we respectfully request that she be permitted to continue with her physical and mental health treatment without disruption by incarceration as discussed in detail below.

## MENTAL HEALTH, MEDICAL AND EDUCATION CONCERNS

### [(2)(D) To Provide the Defendant with Needed Educational or Vocational Training, Medical Care or Other Correctional Treatment in the Most Effective Manner]

Ms. Fulton has been diagnosed with Bipolar II Disorder; Adjustment Disorder with Depressive Mood; PTSD; a generalized Psychiatric Disorder; Anxiety; and Depression. She has been prescribed Zyprexa, Latera, and Risperdal for Bipolar Disorder, and that as of June 2018, was prescribed the following medication: Remeron 15 mg, one tablet at bedtime, for depression; Alprazolam, 2 mg disintegrating tablet, twice daily, for anxiety; and Lamictal, 150 mg tablet, 2½ tablets daily, for Bipolar Disorder. (PSR ¶ 73)

Ms. Fulton has been participating in psychotherapy for many years.  As described in the PSR  Treatment notes reveal that the defendant and her treatment providers discuss the depression, anxiety, hopelessness, lack of energy, loss of appetite, periodic insomnia,

forgetfulness, panic attacks, and difficulty concentrating that she has been experiencing as a result of her mental health conditions and the stress related to her current legal difficulties. Records indicate that the defendant reported that, as a child, she was sexually abused by her grandfather and an uncle and that she was physically and emotionally abused by her former significant other (Stephen Cyr). The defendant told her therapist that she was concerned that as a result of her conviction, she might become disqualified from collecting Social Security Disability. Ms. Fulton and her therapist also discussed the stress caused by losing her belongings during Hurricane Irma.  (PSR ¶ 74).

      Through her therapists, Ms. Fulton is working to set limits and be more assertive with her estranged husband and son; that she exercise, paint, write in a journal, practice relaxation and cognitive behavioral therapy techniques; that she focus on self-care; that she participate in a stress management group; that she continue to participate in therapy; and that she continue to comply with her psychotropic medication regimen. Ms. Fulton has been following the recommendations of her therapist and continuity of this therapy is essential.

      Placing Ms. Fulton on probation or time served and supervised release will allow her to continue with her current therapy and medical treatment.  Incarceration will interfere with continuity of counseling and the ability to obtain mental health care and medications and treatment while in prison.  A prison sentence would be disastrous to her mental health and history which make her vulnerable in prison.

      On top of her personal vulnerability, federal prison authorities are struggling to provide adequate medical care to thousands of inmates because of persistent staffing shortages that have left some institutions with medical staff vacancy rates of 40% or higher, according to a Justice Department review.  Johnson, "Feds struggle to provide prison medical care" USA Today ,

March 28, 2016.  https://www.usatoday.com/story/news/politics/2016/03/28/bureau-of-prisons-justice-department-review/82337734/

The aging inmate population has exacerbated the staffing gaps in recent years, as the government has been increasingly unable to compete with the private sector for medical professionals who are paid exponentially more outside of government, according to the report by Justice Department's inspector general.  *Id.*  Ms. Fulton has tremendous therapeutic and medical needs will most certainly become one of those statistics if she were incarcerated.  She is 51.

Courts have routinely given departures and variances for these issues. *See e.g., U.S. v. Alemenas*, 553 F.3d 27 (1st Cir. 2009) (after granting departure from career offender guideline for defendant charged with crack distribution, district court also varied 43months below the reduced range citing defendant's chronic neck pain and his mental and emotional condition); *U.S. v. Kemph*,2009 WL 667413 (4th Cir. March 13, 2009) (unpub) (district court granted departure for extraordinary physical impairment based on USSG §5H1.4, in light of defendant's asbestosis, glaucoma, chronic pulmonary lung disease, hypertension and psychiatric conditions, and further varied 52 months below the guideline range); *U.S. v. Duhon*, 541 F.3d 391 (5th Cir. 2008) (60 months probation upheld for possessing 15 images of child porn, despite guideline range of 27-33 months, in light of this first-time offender's need to continue medical treatment with his psychologist); *U.S. v. Polito*, 215 F. App'x 354 (5th Cir. 2007) (affirming 5-year term of probation granted defendant who possessed child porn finding imprisonment would interfere with his mental health treatment for problems that included anxiety disorder, adjustment disorder, depressive personality disorder, and bipolar disorder); *U.S. v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (three years probation imposed for conspiracy todistribute cocaine rather than 60 month guideline term, based on 54-year-old's serious health problems, including anxiety,

10

depression, nervous disorders and heart disease); *U.S. v.Thompson*, 206 F. App'x 642 (8th Cir. 2006) (court varied from 135-168 month due to defendant's drug addiction and bipolar disorder); *U.S. v. Duhon*, 541 F.3d 391(5th Cir. 2008) (60 months probation upheld for possessing 15 images of child porn, despite guideline range of 27-33 months, in light of this first-time offender's need to continue medical treatment with his psychologist); *U.S. v. Polito*, 215 F. App'x 354 (5th Cir. 2007) (affirming 5 year term of probation granted defendant who possessed child porn six years finding imprisonment would interfere with his mental health treatment for problems that included anxiety disorder, adjustment disorder, depressive personality disorder, and bipolar disorder); *U.S. v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (three years probation imposed for conspiracy to distribute cocaine rather than 60 month guideline term, based on 54-year-old's serious health problems, including anxiety, depression, nervous disorders and heart disease); *U.S. v. Thompson*, 206 F. App'x 642 (8th Cir. 2006) (court varied from 135-168 month advisory range to 110 months apparently due to defendant's drug addiction and bipolar disorder); *U.S. v. Carmona-Rodriguez*, 2005 WL 840464 (S.D.N.Y. April 11, 2005) (unpub.) (court imposed below guideline sentence on 55 year old with no priors pled guilty to distributing drugs, in part because defendant suffered from high blood pressure and diabetes and had received psychiatric treatment for anxiety and depression since 1994).

## GUIDELINES

### [(3) The Kinds of Sentences and (4) the Applicable Sentencing Range Under the Guidelines, and (5) Any Pertinent Policy Statements]

Ms. Fulton has objected as has the government to enhancement for selling to an athlete and internet mass marketing. *See* Government and Defense Objections #1 and #2.As to the

enhancement for selling to an athlete, neither party is seeking this enhancement nor did the parties agree on this enhancement as part of Ms. Fulton's plea agreement which was for good reason. As a threshold matter, ¶ 15 which is used by the probation officer to give Ms. Fulton these additional points, does not involve Ms. Fulton nor is there any information that she knew that any customers were athletes. She was not involved in bodybuilding nor did she use steroids as some of the other defendants did. Indeed, the government objected to the enhancement that "[t]here is no evidence that the Fultons were aware that Lopilato was distributing steroids to professional athletes. The government is unaware of the Fultons assisting Lopilato with recruiting customers, and there is no evidence that they were aware that any of the people to whom they were shipping steroids were professional athletes." Government Objection #2.

Apart for the lack of awareness or reasonable foreseeability, according to the Guidelines, for purposes of subsection (b)(9), "athlete" means an individual who participates in an athletic activity conducted by (A) an intercollegiate athletic association or interscholastic athletic association; (B) a professional athletic association; or (C) an amateur athletic organization." The "athlete" according to probation were professional bodybuilders. (PSR ¶15). This provision does not apply to bodybuilders who are not athletes.

The purpose of this enhancement was clearly not to protect bodybuilders but concern for the use of steroids in professional sports, and, more importantly, the use of steroids among college and high school athletes. *See* 2006 U.S.S.C. Steroids Report at 3. ("Congressional concern is not just about steroid misuse by major league sports professionals but also the trickledown effects that such use has on amateur athletes, notably teenagers.") The term bodybuilder is not found anywhere in that report.

Bodybuilding is not an activity that is offered in high schools or colleges. Bodybuilding is not an athletic event and is not a sport. Merriam Webster defines an athlete as "a person who is trained or skilled in exercises, sports, or games requiring physical strength, agility, or stamina." If a person is using steroids for the purposes of increasing their body mass to flex their muscle they are neither trained nor skilled as athletes.[2]

In Answers.com the response to the question whether bodybuilding should be considered an Olympic sport is: "no, bodybuilding itself is not considered a sport since there are far too many variables in it. It is a form of body modification." Counsel submits that bodybuilding is more like a beauty pageant. Indeed, the participants are not called athletes but contestants.

The supplement industry itself distinguishes bodybuilders from athletes. In N*utrition Distribution LLC v. PEP Research LLC*, the complaint described the supplement company as marketing to "body builders, competitive athletes, and other consumers seeking to improve their physical performance and physiques." 2017 WL 3972509 (C.D. Cal. 2017). *See also*, *In re Lyman Good Dietary Supplements Litigation*, 2018 wL 3733949 (S.D.N.Y 2018) (describing products as fit for any category bodybuilder, *athlete*, or weekend warrior;" *Hi-Tech Pharmaceuticals, Inc. v. Hodges Consulting, Inc.*, 230 F.Supp.3d 1323, 1326 (N.D. Ga. 2016) ("A large and profitable industry has arisen to supply *athlete and bodybuilders* with dietary supplements that purport to give a chemical induced competitive advantage" (emphasis added)). In other words, distributors of supplement products in the industry distinguishes between body builders and athletes. *In United States v. Shortt*, 485 F.3d 243 (4th Cir. 2007) the Fourth Circuit similarly distinguishes "athletes" and "bodybuilders" in particular with respect to testing. As pointed out in that opinion, body builders are not subject to testing. *Id.*

---

[2] https://en.wikipedia.org/wiki/History_of_Amazon

Use of the internet and mass marketing is another enhancement that was not agreed to by the parties in their plea agreement but which the probation officer has decided to apply to Ms. Fulton anyway.  As the government stated in its objection to this enhancement: "The website that Lopilato created and maintained was not an "interactive computer service."  To the contrary, the website only listed products for sale (with prices) and an email address customers used to contact Mark.  Customers could not interact with Mark using the website, and they could not order steroid products directly off of the website.  Instead, customers emailed Mark to place orders and receive payment instructions." *See* Government Objection #1.

Indeed, internet use enhancements in this day and age for the distribution of a product while perhaps somewhat reasonable at the time enacted, seems outdated and unfair and should not be applied.  Prior to the internet, steroid users would pool their money and buy steroids through mail order.  *See* USSC 2006 Steroid Report at 18.  Yet no enhancement was made for use of mail order.  Interestingly, the 2006 Steroid Report describes how now days there are no large suppliers because steroids can be obtained through international mail order or through the internet, yet, there is no enhancement for using an international mail order to send steroids.

Technology has changed, not criminal seriousness.  This same criticism has been leveled against other offenses with this enhancement but at least there is arguably some logic to those enhancements.  For example, use of a computer for child pornography offenses, the offense itself is related to the crime that is "viewing".  Here, the internet is just a conduit for providing a physical substance like a pair of shoes from Zappo or a toy from Amazon in what used to be done through snail mail with no enhancement for that use.  Use of internet and

email is an internet activity but it is the equivalent of mail in the pre-internet world where there was no enhancement.

In 2004, when these concerns were debated in Congress, Amazon was primarily an on-line bookstore which itself was novel, no pun intended, at the time. Starting in 2005 Amazon introduced Amazon prime and became a full scale provider of goods. https://en.wikipedia.org/wiki/History_of_Amazon. That was nearly 15 years ago and how consumers buy products has changed radically and the use of the internet is no longer unusual. Internet use overall jumped from 9.4 hours a week in 2000 to 23.6 hours a week in 2017.[3]

In addition, the probation officer has used the argument that Ms. Fulton should not receive a reduction in role because only the amounts she was directly involved with were charged to her but then she is being given an additional two points for Mr. Lopalito's activities and no minor role reduction. *See* USPO Answer to Defendant's Objection #2. The same argument should be used consistently and Ms. Fulton should not receive an enhancement for Mr. Lopolito's activities that were in fact not known even if they were mass marketing which was not the case. It should be emphasized that Judge Saris declined to give either enhancement to co-defendant Michael Lopalito despite probation requesting it and doing so would result in unwarranted disparity.

The defense believes the guidelines should be 12-18 months with minor role. Regardless of her ultimate guidelines range, this Court should vary to a non-incarceratory sentence. In *Nelson v. United* States, 129 S.Ct. 890 (2009), a summary *per curium,* decision, the United States Supreme Court explained that the guidelines enjoy no special place in the range of circumstances. "Our cases do not allow sentencing court to presume that a sentence within the Applicable Guidelines range is reasonable." *Id.* at 892. The Supreme Court made the

---

[3] https://news.usc.edu/134580/internet-use-at-home-soars-to-more-than-17-hours-per-week/

15

same point in *Rita v. United States*, 551 U.S. 338 (2007) as well as in *Gall v. United States,* 552 U.S. 38, 49-50 (2007) (although it is "starting point and the initial benchmark" for constructing a sentencing, the sentencing court "may not presume that the Guidelines range is reasonable.").

As the Supreme Court confirmed in *Gall*, the Guidelines are not the sole, nor even the first among factors that Congress has commanded the courts to apply in section 3553(a). *Id.* The Court "may not presume that the Guidelines range is reasonable" and "must make an individualized assessment based on the facts presented." *Id.* Specifically, this Court must "consider every convicted person as an individual[,] and every case as a unique study in the human failing that sometimes mitigate, sometimes magnify, the crime and the punishment." *Gall*, 552 U.S. at 52 (quoting *Koon v. United States,* 518 U.S. 81, 113 (1996)).

Studies have shown that lengthier sentences do not deter recidivism.  *See,* Michael Tonry, *Purposes and Functions of* Sentencing, 34 Crime and Justice: A review of Research 28-29 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").  The Guidelines' offense level is not intended or designed to predict recidivism." *See* USSC, Measuring Recidivism.[4]

As the Second Circuit advised in *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008): "It is now, however, emphatically clear that the Guidelines are guidelines-that is, they are truly advisory.  A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.  District judges are, as a result, generally free to impose sentences outside the recommended range."

---

[4] http://www.ussc.gov/publicat/ RecidivismGeneral.pdf.

In addition, 28 USC § 994(k) provides:

(k) The Commission shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment.

The Guidelines' offense level is not "intended or designed to predict recidivism." *See* USSC, Measuring Recidivism.[5]  However, defendants with a Criminal History Category of I like Ms. Fulton have a substantially lower risk of recidivating.  *Id.*  Moreover, Recidivism rates decline consistently as age increases."  *See* id. at 12.  "Generally, the younger the offender, the more likely the offender recidivates." *Id*  Again, Ms. Fulton is 51.

Ms. Fulton's crime was situational related directly to her relationship with her husband and her history of abuse and capitulation.  She and her husband have separated and she is in the process of rebuilding her life with the care and support of her family, her doctors and her therapists.  An incarceratory sentence would severely disrupt that treatment and given her fragile mental health she would be vulnerable to abuse in prison.

**AVOID UNWARRANTED DISPARITY**

**[(6) The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Engaged in Similar Conduct]**

As set forth in the PSR, no co-defendant to date has been sentenced to anything but probation or time served and supervised release regardless of their role or involvement. *See* PSR pages 3-4.  For example, Robert Morello purchased wholesale quantities of steroids and

---

[5] at http://www.ussc.gov/publicat/ Recidivism General.pdf.

17

deposited monies into a co-conspirators account in excess of $30,000 and received time served and two years of supervised release. *Id.* Michael Lopalito set up the website and updated the website for the steroids. He received one year of probation from Judge Saris. *Id.* Scott Birchall who was working with Morello was discovered at the time the search warrant was executed with $26,000 and 7,850 units of steroids and received time served and three year of supervised release. A sentence of probation or time served and supervised release for Ms. Fulton would avoid unwarranted disparity.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that Ms. Fulton receive time served and a period of supervised release and a fair and just sentenced in this case and no more than necessary to achieve the purposes of 18 U.S.C. 3553(a).

Respectfully submitted:

*Attorney for Ms. Fulton*

*/s/ Inga L. Parsons*

Inga L. Parsons (BBO #675211)
Law Offices of Inga L. Parsons
3 Bessom Street, No. 234
Marblehead, MA  01945
Tel:    (781) 581-2262
Email:  inga@ingaparsonslaw.com

## CERTIFICATE OF SERVICE

I, Inga L. Parsons, hereby certify that the foregoing motion was served on May 24, 2018 by this Court's ECF System to all counsel of record.

/s/ Inga L. Parsons
Inga L. Parsons